UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JULINDA K. TARVER,

      Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

Case No. 2:20-cv-11570
District Judge Denise Page Hood
Magistrate Judge Kimberly G. Altman

_____/

## REPORT AND RECOMMENDTION ON CROSS MOTIONS FOR SUMMARY JUDGMENT

I.      Introduction

This is a social security case.  Plaintiff Julinda K. Tarver brings this action under 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security (Commissioner) denying her application for Disability Insurance Benefits (DIB) under the Social Security Act (the Act).  Both parties have filed summary judgment motions (ECF Nos. 12, 16), which have been referred to the undersigned for a Report and Recommendation under 28 U.S.C. § 636(b)(1)(B).

For the reasons set forth below, substantial evidence supports the Administrative Law Judge's (ALJ) conclusion that Tarver is not disabled under the

1

Act.  Accordingly, it is RECOMMENDED that the Commissioner's Motion for

Summary Judgment (ECF No. 16) be GRANTED, Tarver's Motion for Summary

Judgment (ECF No. 12) be DENIED, and that the ALJ's decision be AFFIRMED.

## II.      Background

### A. Procedural History

Tarver was 61 years old at the time of her alleged date of onset of October

29, 2017.  (ECF No. 10, PageID.207).  She worked as a senior analyst in insurance

from April of 1990 until April of 2017.  (*Id*., PageID.232).  She alleged disability

due to heart failure, pulmonary hypertension, autoimmune disease, osteoarthritis of

both knees, fluid in plural cavity, asthma, double vision, and obesity.  (*Id*.,

PageID.233).

After Tarver's DIB application was denied at the initial level on June 20,

2018 (*Id*., PageID.58, 138-145), she timely requested an administrative hearing,

which was held on September 9, 2019, before the ALJ.  (*Id*., PageID.73-117).

Tarver testified at the hearing, as did a vocational expert (VE).  (*Id*.).

Tarver testified that she lived alone in a colonial house.  (*Id*., PageID.79).

She went to the basement once or twice a month but went upstairs everyday as that

was where her bedroom was located.  (*Id*.)  Climbing stairs was "painful" for

Tarver, and she used rails to help her climb.  (*Id*.)

Tarver worked consistently for over 40 years without taking any breaks. (*Id.*, PageID.80). She had suffered significant medical problem since the 1990s. (*Id.*) In 2016, Tarver was hospitalized for congestive heart failure and missed three or four weeks of work. (*Id.*) Upon returning to work, Tarver began to experience "significant problems with [her] eyes" and missed about three additional weeks of work. (*Id.*) When she returned to work, Tarver had to wear an eye patch for about four months. (*Id.*) Tarver stopped working when at 61 years of age; she had intended to work until at least 62 years of age but was unable to do so. (*Id.*, PageID.80-81).

Tarver worked with numerous doctors including a rheumatologist, a pulmonologist, a cardiologist, a gastroenterologist, an ophthalmologist, and a primary care physician. (*Id.*, PageID.81). This was because Tarver suffered from an autoimmune disorder that "affect[ed] the whole body," including her heart. (*Id.*) The autoimmune disorder was controlled in the 1990s with a regimen of Methotrexate and Prednisone, but when Tarver stopped taking these medications the disorder reemerged. (*Id.*, PageID.81-82).

Tarver suffered "pain in [her] eyes from looking at a screen" and suffered from general light sensitivity. (*Id.*, PageID.82). In addition to the pain, she also suffered from blurred or double vision. (*Id.*).

3

Since 2017, Tarver had symptoms related to her heart that included shortness of breath, fluid in her lungs, a fluid gap in her heart, and AFib. (*Id.*, PageID.82-83). The last time that Tarver suffered heart failure it was caused by "a heart valve that's not doing what it's supposed to do." (*Id.*). In October of 2017, Tarver underwent cardiac rehabilitation three times each week for several months. (*Id.*, PageID.83). For a while after the cardiac rehabilitation, Tarver stopped feeling fatigued; however, the fatigue came back. (*Id.*) She can no longer do things at the same pace as she did before 2017. (*Id.*)

Tarver also suffered from swelling in her legs that was caused by her heart problems. (*Id.*, PageID.83-84). To alleviate the swelling, Tarver had to frequently change positions from sitting to standing to laying. (*Id.*, PageID.84). She also elevated her legs on the couch or bed about twice each day. (*Id.*).

Tarver also had an inflammatory muscle disease, which caused "pain and weakness." (*Id.*, PageID.86). If she sat for a while, she became stiff. (*Id.*). Upon moving, she experienced pain, so she was prescribed medications to help. (*Id.*). However, Tarver discovered that over-the-counter medications worked better than her prescribed medications. (*Id.*). Tarver also suffered from pain and cramping of her hands. (*Id.*, PageID.87). She discovered that moving her hands, running hot water on them, or massaging them helped alleviate the pain. (*Id.*) Her fingers also bothered her, and she had difficulty typing for long periods. (*Id.*, PageID.88).

Tarver had her right knee replaced in 2014 and her left knee replaced in May of 2019.  (*Id*., PageID.89, 102).  She used a cane both for her knee and balance because she "[felt] off balance with all of the meds."  (*Id*., PageID.90).  She also had the shingles, which caused "[i]tching and burning from [her] navel to [her] back on the left side."  (*Id*., PageID.89).  Tarver took Gabapentin to treat the shingles.  (*Id*., PageID.90).  However, Gabapentin made her "tired and sleepy." (*Id*.).

Tarver took several medications.  (*Id*., PageID.84-85).  She was taking Prednisone from the date of onset until March of 2019.  (*Id*.)  Tarver stopped taking Prednisone because she did not feel like her "normal self" as the medication made her "feel like [she] needed to sit still."  (*Id*., PageID.85).  Tarver was taking Methotrexate for a period, but her doctors switched her to CellCept as Methotrexate was causing scarring in her lungs.  (*Id*.)  On her current medications, Tarver suffered from dizziness, difficulty standing, and forgetfulness.  (*Id*.)

Tarver had only attended church twice since June of 2019.  (*Id*., PageID.83). She also rarely had company because she was unable to handle stress.  (*Id*.). Tarver had her driver's license, but only drove to the grocery store as she was not supposed to drive on her prescribed medications and also felt "a little dizzy on the road."  (*Id*., PageID.86).  Tarver did not drive at night as the lights hurt her eyes. (*Id*.).

5

Tarver had difficulty sleeping.  (*Id*., PageID.90).  She experienced pain in her hips as well as a stiff neck.  (*Id*.).  She used an airplane pillow to stabilize her neck while she slept.  (*Id*.).  Additionally, she woke up approximately every two hours to use the bathroom.  (*Id*.).  Tarver experienced more bad days than good days in regard to her symptoms and energy level.  (*Id*., PageID.91).

On September 30, 2019, the ALJ issued a written decision finding that Tarver was not disabled.  (*Id*., PageID.55-69).  On May 1, 2020, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  (*Id*., PageID.38-42).  Tarver timely filed for judicial review of the final decision.  (ECF No. 1).

## B. Medical Evidence

On October 10, 2016, Tarver went to Henry Ford Hospital because she was experiencing problems with her eyes.  (ECF No. 10, PageID.304-305).  The assessment indicates that she had "[i]schemic partial, pupil-sparing third (oculomotor) nerve palsy OD, resolving," "[a]ge related nuclear and cortical cataracts OU, may be visually significant," "[r]ight occipital neuralgia," a "[m]ildly enlarged pituitary gland," and myopia.  (*Id*., PageID.304).  A plan was created for Tarver that included taking aspirin, controlling her blood pressure and blood sugar, wearing a patch over her right eye as needed, and monitoring her cataracts.  (*Id*.).  On her next visit, she was to receive dilation and a repeat of her

6

strabismus measurements.  (*Id*.).  Additionally, a letter was sent to her primary care physician and neurologist regarding her enlarged pituitary gland.  (*Id*.).  On February 22, 2017, Tarver returned to Henry Ford Hospital, and the assessment was much the same as the October 10, 2016 assessment.  (*Id*., PageID.306-308).  Notably, however, the "[i]schemic partial, pupil-sparing third (oculomotor) nerve palsy OD" had resolved.  (*Id*., PageID.306).

On June 14, 2017, Tarver began treating with the Family Doctor Clinic.  (*Id*., PageID.287-296).  Office records indicate that Tarver's past surgeries included a right knee replacement and a gastric sleeve.  (*Id*., PageID.287).  Her medical problems included eye problems, arthritis, and allergies.  (*Id*.).  Tarver's BMI was 37.7.  (*Id*., PageID.291).  Her chief complaint was left knee pain.  (*Id*., PageID.288-289).  Tarver took Motrin to help manage the knee pain, but it was not helping.  (*Id*., PageID.289).  The plan created indicated that Tarver was to stop taking Motrin, start a Medrol pack, and receive an orthopedic evaluation.  (*Id*., PageID.296).

On June 14, 2017, Tarver had her left knee X-rayed.  (*Id*., PageID.297).  The impression was "mild to moderate degenerative joint disease."  (*Id*.).  Tarver then presented to the Beaumont Orthopedic Institute on August 11, 2017, for an orthopedic evaluation.  (*Id*., PageID.298-303).  At the visit, Tarver received an injection in her left knee.  (*Id*., PageID.300).  She was told to return in three

months to determine if injections and therapy were helping her knee or to decide if she wanted to proceed to knee replacement. (*Id*.).

From October 28, 2017 through November 1, 2017, Tarver received inpatient care at Henry Ford Hospital. (*Id*., PageID.309-332). She "presented to [the] ER with shortness of breath and dry cough that progressively worsened over the past 10 days." (*Id*., PageID.309). "She ha[d] associated dry cought [sic] chest tightness." (*Id*.). "She was admitted for asthma and COPD and treated with steroids and Lasix. She was improved clinically and had a routine echo ordered which showed evidence of tamponade." (*Id*., PageID.320). After a cardiac evaluation, Tarver was assessed with pericardial effusion with cardiac tamponade. (*Id*., PageID.320-324). As a result, Tarver "was advised to avoid diuretics and follow up with echocardiogram as [an] outpatient." (*Id*., PageID.326).

On November 7, 2017, Tarver saw Salim Meram, M.D., as an outpatient of Henry Ford Hospital. (*Id*., PageID.333). The diagnoses for the visit were borderline hypertension, morbid obesity, chronic diastolic congestive heart failure, and pericardial effusion. (*Id*., PageID.335). Dr. Meram counseled Tarver to "cut down significantly on her salt intake, try to lose some weight and exercise . . . ." (*Id*.). He also instructed her to return in two weeks so a nurse could recheck her blood pressure and provided Tarver with the shingles vaccine. (*Id*., PageID.335-336).

From November 16, 2017 through November 26, 2017, Tarver was once again admitted to Henry Ford Hospital.  (*Id*., PageID.337-377).  Tarver "presented with worsening shortness of breath since discharge."  (*Id*., PageID.337).  After an evaluation, it was determined that Tarver need a right and left heart catherization and pericardiocentesis.  (*Id*., PageID.337, 339, 343).  On November 23, 2017, the right heart catherization was performed, however, no pericardiocentesis was performed because of a "lack of hemodynamic evidence."  (*Id*., PageID.349).

It was also noted that Tarver was diagnosed with dermatomyositis[1] in 1991, and received care for it until 2002.  (*Id*.).  She treated with Methotrexate and steroids until 2002.  (*Id*.).  Tarver "denie[d] any muscle weakness or rash," but did report "chronic pain of her bilateral knees and hips."  (*Id*.).  She also indicated that since May of 2017, she "started to experience some arthralgias of bilateral elbows and hands with bilateral hand swelling and morning stiffness that lasts about 20 [minutes]."  (*Id*.).  As a result, Tarver was "unable to make a complete fist."  (*Id*.).  Based on Tarver's "clinical history, exam, and positive high tier ANA, there [was] concern for [connective tissue disease]."  (*Id*., PageID.353).  While Tarver's

---

[1] "Dermatomyositis (dur-muh-toe-my-uh-SY-tis) is an uncommon inflammatory disease marked by muscle weakness and a distinctive skin rash." https://www.mayoclinic.org/diseases-conditions/dermatomyositis/symptoms-causes/syc-20353188 (last accessed June 30, 2021).

dermatomyositis appeared stable, further autoimmune workup was recommended. (*Id.*).

On December 6, 2017, Tarver went to Henry Ford Hospital's rheumatology clinic for an evaluation of her dermatomyositis.  (*Id.*, PageID.378-386).  The assessment indicated that "[a]utoimmune connective tissue disease may be [the] cause of her clinical picture."  (*Id.*, PageID.383).  The assessment further stated that it was "[l]ess likely to be dermatomyositis because that does not appear to be active."  (*Id.*).  Further assessment of Tarver was needed to definitively determine the cause of her medical problems.  (*Id.*, PageID.383-384).

On December 11, 2017, Tarver presented to Henry Ford Hospital's Pulmonary Hypertension Program for a follow up regarding her pulmonary hypertension.  (*Id.*, PageID.387-396).  The physician recommended switching Tarver's asthma medication to assist with her shortness of breath (dyspnea).  (*Id.*, PageID.393).  He opined that "the cause of her restrictive lung disease as well as a large degree of her exertional dyspnea [was] due to ongoing pleural effusions as well as pericardial effusion."  (*Id.*).  He also indicated that a CT of Tarver's lungs was "suggestive of interstitial lung disease . . . likely associated with her dermatomyositis."  (*Id.*, PageID.393-394).  Because Tarver was experiencing "ongoing fatigue and joint arthralgias as well as muscle weakness and myalgia," the physician recommended that she follow up with her rheumatologist for

10

consideration of increased immunosuppressive therapy for treatment of an active flareup of dermatomyositis.  (*Id*., PageID.394).

On December 19, 2017, Tarver went to the Outpatient Cardiology Clinic at the Henry Ford Heart & Vascular Institute.  (*Id*., PageID.397-403).  The physician recommended that Tarver get a repeat echocardiogram in three months to reassess her pericardial effusion.  (*Id*., PagedID.403).

At a rheumatologist follow-up appointment on January 2, 2018, Michael Lubetsky, M.D., stated, "Pleural and pericardial effusions felt to be due to flare of dermatomyositis."  (*Id*., PageID.404).  He further indicated that Tarver had started taking Prednisone on December 20, 2017, to treat her dermatomyositis.  (*Id*.).  Tarver reported that since beginning Prednisone she "ha[d] felt more energy, decreased swelling and pain of hands, feet, ankles."  (*Id*., PageID.405).  She did not have any pain or motor weakness at the appointment.  (*Id*.).

On January 31, 2018, the physician at the Pulmonary Hypertension Program, also noted a "[m]arked improvement" since Tarver began taking Prednisone.  (*Id*., PageID.408).  Tarver's "[chest x-ray] [was] stable without recurrence of pleural effusions."  (*Id*.).  The physician ordered a follow-up echocardiogram "to evaluate change in pericardial effusion and right heart function."  (*Id*.).  Tarver reported that she felt much better overall.  (*Id*., PageID.409).  "She denie[d] any joint pain or swelling and there are no rashes."  (*Id*.).  She also reported improved exercise

11

tolerance that included the ability to walk over three blocks without stopping; however, "[s]he [did] feel unsteady on her feet due to 'weak and floppy' muscles of her thighs and arms, but she [thought] this [was] very gradually improving." (*Id.*).

On March 6, 2018, Tarver had a follow-up rheumatology appointment. (*Id.*, PageID.445-448). Tarver reported that since halving her dose of Prednisone, her focus had improved. (*Id.*, PageID.445). However, she also reported a "slightly low" energy level, hand pain, and a rash over her hand joints. (*Id.*). The rash was improving. (*Id.*). Tarver further reported that she had started attending cardiac therapy the week before and that she "ha[d] been moving around more." (*Id.*). The physician decided to start Tarver on Methotrexate along with daily folic acid. (*Id.*, PageID.447).

On March 20, 2018, Tarver had a follow-up cariology appointment. (*Id.*, PageID.459-466). The cardiologist noted that Tarver's effusion had improved/resolved since starting Prednisone and Methotrexate. (*Id.*, PageID.459). On May 1, 2018, Tarver had a follow-up rheumatology appointment. (*Id.*, PageID.475-481). Tarver denied hand and/or feet pain and/or swelling. (*Id.*, PageID.476). She also denied muscle weakness but did report morning muscle stiffness that lasted less than 15 minutes. (*Id.*). Tarver was undergoing cardiac rehabilitation three times each week. (*Id.*). She felt that she was getting stronger

and indicated that her appetite was doing well.  (*Id.*).  Since beginning to exercise,

Tarver had begun to experience left knee pain.  (*Id.*).  Tarver also had a follow-up

appointment regarding her pulmonary hypertension on May 1, 2018.  (*Id.*,

PageID.484-493).  The physician noted that Tarver "appear[ed] to be doing really

well after starting steroids and methotrexate therapy for her dermatomyositis . . . ."

(*Id.*, PageID.491).

On May 6, 2018, Tarver underwent an independent medical examination

performed by Karan Patal, M.D..  (*Id.*, PageID.418-425).  After performing a

record review and physical examination of Tarver, Dr. Patal listed Tarver's

diagnoses as follows:

1. History of Dermatomyositis – resolved
2. Mixed connective tissue disorder – rheumatoid vs lupus
3. Chronic left knee pain with right total knee arthroplasty
4. Asthma
5. Cardiac failure with pulmonary hypertension
6. Obesity

(*Id.*, PageID.424).  Dr. Patal also completed a functional assessment of Tarver.

(*Id.*).  Dr. Patal opined that there were no limitations regarding the number of hours

that Tarver could sit or stand during an eight-hour workday, however, due to

Tarver's history of cardiac failure with pulmonary hypertension, Dr. Patal limited

the number of hours she could walk to four.  (*Id.*).  Dr. Patal further opined that

Tarver did not require any limitations related to weight bearing, bending, stooping,

squatting, crouching, and/or crawling, or reaching, pushing, pulling, handling,

grasping, fingering, and/or feeling.  (*Id*.).  Dr. Patal recommended that Tarver use a cane to assist with her left knee pain which was caused by osteoarthritis.  (*Id*.).  Finally, Dr. Patal opined that Tarver did not need any visual, communicative, or other workplace environmental limitations.  (*Id*.).

On May 8, 2018, Tarver had a follow-up appointment with Dr. Meram regarding her chronic medical problems.  (*Id*., PageID.495-500).  Tarver reported that she was "feeling much better now."  (*Id*., PageID.495).  She indicated that she had two weeks left of cardiac rehabilitation.  (*Id*.).  She denied any eye problems but reported left knee pain.  (*Id*.).  Tarver returned to Dr. Meram on June 26, 2018, to report a new medical issue.  (*Id*., PageID.506-511).  After experiencing pain and achiness along with a rash and diarrhea, Tarver went to an urgent care clinic where she was diagnosed with shingles.  (*Id*., PageID.506).  Dr. Meram confirmed the diagnosis and noted that Tarver's "symptoms [were] worsened because she [was] on prednisone and methotrexate for dermatomyositis."  (*Id*., PageID.509).

On August 1, 2018, Tarver had a follow-up appointment for her pulmonary hypertension.  (*Id*., PageID.515-523).  Tarver reported that she had completed cardiac rehabilitation, but that she had been unable to continue exercising since being diagnosed with shingles.  (*Id*., PageID.516).  The physician noted that Tarver "appear[ed] to be stable from a [pulmonary hypertension] standpoint."  (*Id*., PageID.521).

On August 13, 2018, Tarver had a follow-up appointment with Dr. Meram regarding her shingles diagnosis. (*Id*., PageID.524-528). Tarver reported "feel[ing] tired and spacing." (*Id*., PageID.524). She also reported that, although the rash had healed, she still had itchiness and burning at the site of the rash. (*Id*.). Tarver failed to properly take the Gabapentin that Dr. Meram prescribed on June 26, 2018. (*Id*.). Dr. Meram counseled Tarver that the itching and burning was postherpetic neurologia and that she needed to take the prescribed Gabapentin on a regular basis. (*Id*.).

On August 14, 2018, Tarver had an interstitial lung disease program consult where she was evaluated for interstitial lung disease. (*Id*., PageID.529). After the evaluation, Tarver was diagnosed with interstitial lung disease secondary to dermatomyositis. (*Id*., PageID.536). Tarver did not have activity limitations or oxygen requirements. (*Id*.). The physician recommended switching Tarver from Methotrexate to CellCept because of the risk of pulmonary toxicity from Methotrexate. (*Id*.).

On August 23, 2018, Tarver had a rheumatology appointment. (*Id*., PageID.549). Tarver complained of morning stiffness that lasted under 15 minutes and tiredness and fatigue. (*Id*., PageID.549-550). She denied any hand/foot pain, swelling, or muscle weakness. (*Id*., PageID.549). Tarver reported that she used a cane for ambulation. (*Id*., PageID.550). The physician switched Tarver from

Methotrexate to CellCept.  (*Id.*, PageID.552).  Tarver also had routine cardiology, pulmonary, and rheumatology appointments that occurred on September 25, 2018, November 14, 2018, and December 6, 2018.  (*Id.*, PageID.558-564, 582-601, 607-611).  On September 28, 2018, Tarver received an injection in her left knee to help with pain.  (*Id.*, PageID.433-436).

On December 17, 2018, Dr. Meram completed a medical assessment of Tarver's ability to do work related activities (physical).  (*Id.*, PageID.429-431). Tarver's listed diagnoses were dermatomyositis, severe osteoarthritis, and pulmonary hypertension.  (*Id.*, PageID.429).  Her prognosis was "guarded" because of her need for "continuous medications [and] follow up."  (*Id.*).  Tarver's symptoms included shortness of breath, fatigue, lower back and knee pain that became worse with ambulation, and limited tolerance of moderate activity.  (*Id.*). Tarver was currently taking CellCept as prescribed by her rheumatologist and may need to take steroids if her condition was exacerbated.  (*Id.*).  Her history included a total right knee replacement and cortisone injections in her left knee.  (*Id.*).

Dr. Meram opined that Tarver could lift no more than five pounds.  (*Id.*). She could only stand/walk for 60 minutes in an eight-hour workday for 10 to 15 minutes at a time.  (*Id.*, PageID.430).  Tarver could sit for two to three hours before needed to stand or walk a short distance.  (*Id.*).  Her legs did not require elevation. (*Id.*).  Tarver would require two to three hours of rest in an eight-hour workday.

(*Id*.). She did not "have significant limitations with reaching, handling or fingering." (*Id*.). Tarver's pain would frequently "interfere with the attention and concentration needed to perform even simple work tasks." (*Id*., PageID.429). Dr. Meram estimated that Tarver would need to miss more than four days each month from work. (*Id*., PageID.430).

On February 20, 2019, Tarver had a routine pulmonary appointment. (*Id*., PageID.618-641).

On March 1, 2019, Tarver returned to the clinic where she had previously received a left knee injection and again complained of left knee pain. (*Id*., PageID.436). While the September 28, 2018 injection helped at the time, her pain had begun increasing which limited her quality of life. (*Id*.). At its worst, Tarver rated the pain a 10 out of 10. (*Id*.). Tarver was interested in a left knee replacement. (*Id*.). Tarver received the left knee replacement on May 1, 2019. (*Id*., PageID.439, 441-443).

On June 6, 2019, Tarver had a routine rheumatology appointment and it was noted that "her dermatomyositis seem[ed] to be well controlled." (*Id*., PageID.654-658). At her left knee postoperative appointment on June 7, 2019, Tarver indicated that she "ha[d] been doing fairly well," but was "struggling a bit with her motion." (*Id*., PageID.439). However, Tarver's pain was controlled, and she was overall happy. (*Id*.). It was recommended that Tarver pursue more

aggressive physical therapy to assist with a "10-15 degree flexion contracture." (*Id*.).

Tarver was hospitalized at Henry Ford Hospital from June 8, 2019 until June 11, 2019. (*Id*., PageID.659). Tarver presented to the emergency room complaining of tachycardia and shortness of breath. (*Id*., PageID.661-663). The tachycardia resolved when Tarver was given IV medication and the shortness of breath resolved after Tarver was diuresed. (*Id*., PageID.686).

On June 25, 2019, Tarver had a cardiology appointment. (*Id*., PageID.707). Tarver was prescribed a beta blocker in the hospital and the dosage was subsequently decreased. (*Id*.). Since decreasing the dosage, Tarver's heart palpitations had returned. (*Id*.). Accordingly, she returned to taking the original dosage of the beta blockers. (*Id*.). Tarver then began experiencing fatigue. (*Id*.).

### III.    Framework for Disability Determinations (the Five Steps)

Under the Act, DIB is available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The

Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, No. 08-10279, 2008 WL 4793424, at *4 (E.D. Mich. Oct. 31, 2008), citing 20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps. . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the

[Commissioner]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Following this five-step sequential analysis, the ALJ found that Tarver was not disabled under the Act.  At Step One, the ALJ found that Tarver had not engaged in substantial gainful activity since October 29, 2017 (the alleged onset date).  (*Id.*, PageID.60).  At Step Two, the ALJ found that she had the severe impairments of osteoarthritis of the knees bilaterally with bilateral knee replacements, hypertension with cardiac heart failure, obesity with history of gastric sleeve, and history of dermatomyositis.  (*Id.*)  At Step Three, the ALJ found that Tarver's impairments, whether considered alone or in combination did not meet or medically equal a listed impairment.  (*Id.*, PageID.61).

The ALJ then assessed Tarver's residual functional capacity (RFC), concluding that she was capable of performing sedentary work

> except the claimant can only occasionally climb stairs; she can occasionally crouch, crawl, kneel, stoop, and bend; she must avoid workplace hazards such as dangerous, moving machinery, and unprotected heights; she cannot climb ladders, ropes, or scaffolding; she can frequently grasp and gross manipulate objects with her bilateral upper extremities; and she can frequently finger and fine manipulate objects with her bilateral upper extremities.

(*Id.*, PageID.61).

At Step Four, the ALJ found that Tarver could perform her past relevant work as a systems analyst.[2]  (*Id*., PageID.67-68).  The ALJ credited the VE's testimony that a hypothetical person in Tarver's position could perform her past relevant work as a policy holder information clerk supervisor, a systems analyst, and a senior systems analyst if she "[were] able to perform the full range of a light exertional job."  (*Id*., PageID.68, 111-112).  If the hypothetical person was limited to sedentary work along with other limitations, then she could still perform the two system analyst jobs.  (*Id*., PageID.112).  As a result, the ALJ concluded that Tarver was not disabled under the Act.  (*Id*., PageID.69).

## IV.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision under 42 U.S.C. § 405(g).  Although the court can examine portions of the record that were not evaluated by the ALJ, *Walker v. Sec. of Health & Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989), its role is a limited one.  Judicial review is constrained to deciding whether the ALJ applied the proper legal standards in making his or her decision, and whether the record contains substantial evidence supporting that decision.  *Tucker v. Comm'r of Soc. Sec.*, 775

---

[2] Tarver described the senior analyst job as follows: "Make computer system changes, Correct errors in system payments, System quality assurance.  advise, instruct, train analyst.  Conduct audits, Interview potential candidates, provide a conceptual design to fix a problem or provide a service for customers.  Conduct and attend meetings."  (ECF No. 10, PageID.340).

21

F. App'x 220, 224–25 (6th Cir. 2019)); *see also Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007) (noting that courts should not retry the case, resolve conflicts of evidence, or make credibility determinations); *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017) (same).

An ALJ's factual findings must be supported by "substantial evidence." 42 U.S.C. § 405(g).  The Supreme Court has recently explained what that term means:

> Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations.  And whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high.  Substantial evidence, this Court has said, is more than a mere scintilla.  It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotations omitted).

In making "substantial evidence" the relevant standard, the law preserves the judiciary's ability to review decisions by administrative agencies, but it does not grant courts the right to review the evidence de novo.  *Moruzzi v. Comm'r of Soc. Sec.*, 759 F. App'x 396, 402 (6th Cir. 2018) ("The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.") (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009)).  An ALJ's factual findings are therefore subject to multi-tiered review, but those findings are conclusive unless the record lacks sufficient evidence to support them.  *Biestek*, 139 S. Ct. at 1154.

Although the substantial evidence standard is deferential, it is not trivial. The Court must " 'take into account whatever in the record fairly detracts from [the] weight' " of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (internal quotations omitted). Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (internal quotations omitted).

## V.    Analysis

Tarver presents a single argument in seeking summary judgment. She argues that while the ALJ determined that she has severe, medically determinable impairments, the ALJ failed to consider the functionally limiting effects of these impairments when crafting Tarver's RFC. Specifically, Tarver argues that the ALJ failed to sufficiently account for the limiting effects of dermatomyositis, cardiac heart failure, and Tarver's issues walking. Additionally, the ALJ did not properly consider the number of absences Tarver would have from work.

In response, the Commissioner argues that, when crafting the RFC, the ALJ correctly evaluated Tarver's dermatomyositis.  Further, the ALJ properly discounted Dr. Meram's medical opinion under the new regulations.  Finally, he argues that Tarver has not demonstrated prejudicial error in regard to any limitations in walking or absenteeism.

"A claimant's RFC is an assessment of 'the most [a claimant] can still do despite [his] limitations.' "  *Barton v. Comm'r of Soc. Sec.*, No. 2:20-cv-2182, 2021 WL 1380258, *4 (S.D. Ohio Mar. 25, 2021), *report and recommendation adopted*, 2021 WL 1378983 (S.D. Ohio Apr. 12, 2021) (quoting 20 C.F.R. § 416.945(a)(1)).  "A claimant's RFC assessment must be based on all the relevant evidence in a case file."  *Barton*, at *4 (citing 20 C.F.R. § 416.945(a)(1)).

## A. Dermatomyositis

Tarver faults the ALJ for stating that Tarver had a "history of dermatomyositis," rather than active dermatomyositis.  She argues that the medical evidence in the record supports her position that this is an active disease.  Tarver further argues that dermatomyositis affects her day-to-day life by making it difficult for her to arise from a seated position and causing general tiredness.  However, Tarver does not tie these symptoms to any work-related activities.  She does not explain what limitations should have been included in the RFC.  *See Turvey v. Comm'r of Soc. Sec.*, No. 12-12388, 2013 WL 3271194, at *5 (E.D.

24

Mich. June 27, 2013) (rejecting the plaintiff's challenge to the RFC because he did not "specify any additional work-related functional limitations the ALJ should have, but did not, include in the RFC assessment resulting from his pain or mental impairments"). Accordingly, because Tarver did not specify any additional limitations that the ALJ should have included in the RFC, her argument that ALJ failed to consider dermatomyositis when crafting the RFC should fail.

Furthermore, the ALJ did address Tarver's dermatomyositis in the RFC analysis. The ALJ noted that Dr. Meram sent Tarver to a rheumatologist after her hospitalization in the fall of 2017 because he believed that she needed "immunosuppressive therapy for an active myositis flare." (ECF No. 10, PageID.63). The ALJ further noted that, despite this hospitalization, Tarver "appeared to be doing well . . . with being placed on prednisone." (*Id.*, PageID.65). Ultimately, the ALJ concluded that Tarver's

> underlying medical conditions capable of producing some pain or other limitations, the substantial evidence of record does not confirm or support disabling symptoms or other limitations arising from claimant's impairments. Further, there is no support for concluding that the claimant's impairments were of such severity as to give rise to disabling pain or other limitations. The undersigned concludes that the preponderance of evidence establishes that the claimant has only mild functional limitations in her ability to perform work-related activities.

(*Id.*, PageID.67). This conclusion demonstrates that the ALJ considered, but ultimately rejected, the notion that Tarver's dermatomyositis caused anything other than the mild functional limitations included in the RFC.

25

## B. Cardiac Heart Failure

Tarver argues that the ALJ improperly rejected the medical opinion of Dr. Meram in regard to Tarver's heart problems.  Dr. Meram listed shortness of breath and fatigue as two of Tarver's symptoms.  (ECF No. 10, PageID.429).  He opined that she would need to rest between two and three hours of an eight-hour workday. (*Id.*, PageID.430).

As a preliminary matter, the undersigned notes that Dr. Meram did not tie either the symptoms or rest recommendation to Tarver's heart problems.  However, even assuming that the listed symptoms and rest recommendation were connected to Tarver's heart problems, the ALJ did not err when he rejected Dr. Meram's opinion.  The ALJ explained that "[t]he opinion of Dr. Meram is not persuasive because it is inconsistent with the medical evidence presented prior and subsequent to that determination."  (*Id.*, PageID.67).  This was because

> although the claimant was hospitalized in 2017 on two occasions related to her cardiac heart failure and dermatomyositis, the claimant appeared to be doing well after her cardiac catheter in combination with being placed on prednisone.  On several occasions following the hospitalizations in 2017, the claimant reported having little to no limitations with her activities of daily living, increased energy, and an ability to walk further distances without having shortness of breath. Furthermore, the claimant reported that she was able to walk at least three blocks.  There are also no records substantiating the claimant could not lift more than 5 pounds.  Moreover, the claimant consistently reported she could handle her own personal care and activities of daily living, which would include grocery shopping (an activity which would require her to, at times, carry more than 5 pounds).  As a result, there is no indication from the records that the claimant would be unable to

26

work at the sedentary exertional level with postural and manipulative
limitations, in addition to avoidance of hazards as described in detail
above.

(*Id*.).

Because Tarver's claim was filed on or after March 27, 2017, it is controlled
by the SSA's recently revised rules regarding medical opinion evidence. *See*
*Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg.
5844. Under the revised rules, the ALJ must articulate "how persuasive [she]
find[s] all of the medical opinions and all of the prior administrative medical
findings in [the claimant's] case record." 20 C.F.R. § 404.1520c(b). The ALJ
evaluates the persuasiveness of the medical opinions and prior administrative
medical findings by utilizing the following five factors: (1) supportability; (2)
consistency; (3) relationship with the claimant; (4) specialization; and (5) other
factors. 20 C.F.R. § 404.1520c(c). Supportability and consistency are the most
important factors and the ALJ must explain how she considered these factors in her
decision. 20 C.F.R. § 404.1520c(b)(2).

Here, the ALJ clearly explained how persuasive she found Dr. Meram's
opinion. She focused on the key factors of supportability and consistency by
comparing Dr. Meram's opinion to the medical evidence and explaining how Dr.
Meram's opinion was not supported by the evidence and was overall inconsistent

27

with the evidence.  Therefore, the ALJ did not err when she found Dr. Meram's
opinion unpersuasive.

## C. Walking

Tarver argues that the medical evidence established a clear functional
limitation in regard to Tarver's ability to walk.  The ALJ found that Tarver could
work a sedentary job.  A sedentary job may include walking and standing totaling
"no more than about 2 hours."  SSR 83-10, 1983 WL 31251, at *5.  Tarver argues
that even this much walking is too much for her; she does not state what amount of
walking she would be capable of performing.

To support her argument that she has additional walking limitations, Tarver
relies on six-minute walking tests from June of 2018 and February of 2019 as well
as her self-reported claims that she can only walk around the house, that she has a
slow walking pace, and that she experiences shortness of breath.  In regard to
Tarver's self-reported issues, the ALJ found that "the claimant's statements
concerning the intensity, persistence and limiting effects of these symptoms are not
entirely consistent with the medical evidence and other evidence in the record for
the reasons explained in this decision."  (ECF No. 10, PageID.62).  For instance,
the ALJ noted that "[o]n several occasions following the hospitalizations in 2017,
the claimant reported having little to no limitations with her activities of daily
living, increased energy, and an ability to walk further distances without having

28

shortness of breath." (*Id*., PageID.67).  Tarver does not address these aspects of the record.

Furthermore, in regard to the June of 2018 walking test, the interpretation of that test indicated that Tarver was able to walk 77.5% of the maximum distance. (*Id*., PageID.513).  Notably, "[t]his was within the confidence limit of normal." (*Id*.).  And, in regard to the February of 2019 walking test, the interpretation of that test indicated that Tarver was able to walk 64.1% of the maximum distance.  (*Id*., PageID.620).  On this test, Tarver's result "was below the confidence limit of normal."  (*Id*.).  Meaning that out of the two pieces of evidence that Tarver points to, only one piece demonstrates an other than normal result.  Additionally, even if Tarver has a slower than average walking speed, it is not clear how this would affect her ability to return to her job as a senior systems analyst.  Tarver herself testified that the job required "a lot of sitting and a lot of typing" and "a lot of sitting and reading."  (*Id*., PageID.104-105).  Tarver said nothing about needing to walk, let alone needing to walk at a particular speed.  Accordingly, Tarver has failed to demonstrate that the RFC should have included additional walking limitations or that she was unable to return to her old job because of her slower than average walking pace.

### D. Absences from Work

Finally, Tarver argues that the ALJ failed to account for her inability to return to her old job because of the amount of work she would need to miss.  The VE testified that two absences each month would "affect work."  (ECF No. 10, PageID.113).

Tarver first argues that she needed to attend cardiac therapy three times each week, thus limiting her ability to be present at work.[3]  However, Tarver "has not established any reason to think that [s]he is unable to attend physical therapy sessions after work, on the weekends, during lunch, or on some other schedule." *Pryor v. Comm'r of Soc. Sec.*, No. 14-13325, 2015 WL 12683977, at *7 (E.D. Mich. Aug. 21, 2015), *report and recommendation adopted*, 2015 WL 6735336 (E.D. Mich. Nov. 4, 2015); *see also Barnett v. Apfel*, 231 F.3d 687, 691 (10th Cir. 2000) (holding that courts need not assume that a doctor's appointment would consume an entire day).  Similarly, Tarver has failed to establish that follow-up appointments with her doctors would force her to miss more than two days each month of work.  *See Barnett*, 231 F.3d at 691.

Tarver also argues that her number of hospitalizations would cause absenteeism.  However, the record only establishes a handful of hospitalizations

---

[3] The undersigned notes that the record only establishes that Tarver participated in cardiac rehabilitation through May of 2018.  Thus, it is far from clear whether, from the time of the hearing onward, Tarver would be participating in such therapy.  For the purposes of Tarver's argument, the undersigned will assume that she does need continued cardiac therapy.

totaling approximately 20 days between October of 2017 and June of 2019.  This averages out to about one absence each month.  This level of hospitalization does not render Tarver unable to work.  *Cf. Hawke-Dingman v. Comm'r of Soc. Sec.*, No. 11-15493, 2012 WL 5328674 (E.D. Mich. Sept. 11, 2012), *report and recommended adopted*, 2012 WL 5306218 (E.D. Mich. Oct. 29, 2012) ("It is far from plain that a person requiring hospitalization as frequently as [p]laintiff – 69 days in less than three years (about two days per month) – would be able to maintain substantial gainful employment.").  Therefore, Tarver has failed to establish that she would be absent too many days from work.

Overall, Tarver has failed to establish that the ALJ erred when crafting the RFC or in any other manner.

## VI.   Conclusion

For the reasons set forth above, it is RECOMMENDED that the Commissioner's motion be GRANTED, Tarver's motion be DENIED, and that under sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be AFFIRMED.

Dated: July 6, 2021                               s/Kimberly G. Altman
Detroit, Michigan                                KIMBERLY G. ALTMAN
                                                 United States Magistrate Judge

## NOTICE TO PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation.  Any objections must be filed within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140, 144 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Under Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to

32

Objection No. 2," etc.  If the Court determines that any objections are without

merit, it may rule without awaiting the response.

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of
record and any unrepresented parties via the Court's ECF System to their
respective email or First Class U.S. mail addresses disclosed on the Notice of
Electronic Filing on July 6, 2021.

        s/Marie E. Verlinde
        MARIE E. VERLINDE
        Case Manager